Slip-op 01-88

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: CHIEF JUDGE GREGORY W. CARMAN

_____
                                         :

**SHANDONG HUARONG GENERAL CORP.;**     :
**LIANONING MACHINERY IMPORT & EXPORT**   :
**COMPANY; AND TIANJIN MACHINERY**        :
**IMPORT & EXPORT CORP.,**                    :
                                         :

               **Plaintiffs,**     :
                                         :

        **v.**                  :       **Consol. Court No.:**
                                         :       **00-08-00393**
                                         :

**UNITED STATES,**                    :
                                         :

               **Defendant,**     :
                                         :

**O. AMES COMPANY,**                :
                                         :

               **Defendant-Intervenor.**     :
_____:

[Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is granted in part and denied in part.]

    *Hume & Associates* (Robert T. Hume), Washington, D.C., for Plaintiffs.

    *Stuart E. Schiffer*, Acting Assistant Attorney General; *David M. Cohen*, Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, *Kenneth S. Kessler*, Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, *David Richardson*, Attorney, Officer of the Chief Counsel for Import Administration, United States Department of Commerce, Washington D.C., for Defendant.

    *Wiley, Rein & Fielding* (Charles Owen Verrill, Eileen P. Bradner, Timothy C. Brightbill, Nicholas A. Kessler), Washington, D.C., for Defendant-Intervenor.

                                      Date:  July 23, 2001

**OPINION**

**CARMAN, Chief Judge:** This consolidated action challenges the final and amended final results of the United States Department of Commerce's (Commerce) administrative review of antidumping orders covering certain heavy forged hand tools from the People's Republic of China (PRC). *See Notice of Final Results and Partial Rescission of Antidumping Duty Administrative Reviews: Heavy Forged Hand Tools from the People's Republic of China*, 65 Fed. Reg. 43,290 (July 13, 2000) (*Final Results*) and *Heavy Forged Hand Tools from the People's Republic of China; Amended Final Results of Antidumping Duty Administrative Reviews*, 65 Fed. Reg. 50,499 (August 18, 2000) (*Amended Final Results*). The questions presented are whether Commerce: (a) improperly chose Indian HTS Category 7214.10.09 as the surrogate value for steel inputs; (b) exceeded its authority in correcting a ministerial error; and (c) selected an aberrational surrogate value for pallets. For the reasons stated below, the Court answers questions (a) and (b) in the negative, but answers questions (c) in the affirmative.

**BACKGROUND**

On February 11, 1999, Commerce published a notice of opportunity to request administrative reviews of the antidumping duty order covering heavy forged hand tools from the People's Republic of China (China) imported between February 8, 1998 and January 31, 1999. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 64 Fed. Reg. 6,878 (Feb. 11, 1999). On February 25, 1999, Shandong Huarong General Corp., Lianoning Machinery Import & Export Company, and Tianjin Machinery Import & Export Corp. (collectively, Plaintiffs) requested an

administrative review of the axes/adzes and bars/wedges they entered into the United States during the relevant time period. The O. Ames Company (Defendant-Intervenor) also requested an administrative review of Plaintiffs' entries. On March 29, 1999, Commerce formally initiated its administrative reviews. *See Heavy Forged Hand Tools from the People's Republic of China*, 64 Fed. Reg. 14,860 (Mar. 29, 1999).

Because China is a non-market economy, Commerce selected a surrogate market economy against which to value China's factors of production. As in past administrative reviews, Commerce chose India as the most suitable market economy due to its comparable level of economic development and the fact that it produces a substantial amount of equivalent merchandise.

Commerce initiated its reviews by sending Plaintiffs questionnaires soliciting detailed information about their manufacturing processes. Plaintiffs' responses indicated that three types of steel were used to produce the hand tools subject to the antidumping orders – steel bar, steel billet, and railroad steel scrap. In past administrative reviews, Commerce valued this steel by placing it in Indian HTS category 7214.50 – "Forged Bars and Rods Containing 0.25% or greater but less than 0.6% Carbon." In the year prior to the administrative review at issue, however, this HTS category was removed from the Indian HTS schedule. Commerce, therefore, requested additional information from Plaintiffs regarding the nature of the steel used to make their hand tools, including whether the steel was in billet or bar form, the size and tolerance of the steel used, and whether the steel underwent further processing prior to its use as an input. After reviewing Plaintiffs' responses, Commerce confirmed that a portion of Plaintiffs' hand tools were made from steel billets and railroad scrap, but concluded the majority were made from steel

bars. From this conclusion, Commerce determined that steel bar was an appropriate factor of production.

Commerce notified Plaintiffs of its determination and requested submissions regarding the proper Indian HTS category from which to draw an appropriate surrogate value. Plaintiffs and Defendant-Intervenor both provided surrogate value information and suggested HTS categories. The information submitted, however, did not contain any data for steel bar, but focused solely on steel scrap and steel billet.

On March 8, 2000, Commerce issued its preliminary determination. *See Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China; Preliminary Results and Partial Recission of Antidumping Duty Administrative Reviews*, 65 Fed. Reg. 12,202 (March 8, 2000) (*Preliminary Results*). Commerce selected forged steel bar as a factor of production and calculated the applicable surrogate value by averaging the import price of steel scrap and two other types of steel entered India under Indian HTS Category 7214.10 – "Other bars and rods of iron and non-alloy steel, not further worked than forged, hot-rolled, hot-drawn or hot-extruded, but including those twisted after rolling – Forged bars and rods."

Plaintiffs requested that Commerce disclose the calculations performed in connection with its preliminary determination. Based upon this information, on March 28, 2000, Plaintiffs submitted additional surrogate value data in an attempt to persuade Commerce to utilize either Indian domestic prices or export prices as the benchmark for surrogate value. On April 19, 2000, Commerce held an administrative hearing at which Plaintiffs continued their argument that HTS 7214.10 was not an appropriate category upon which to base surrogate value. Plaintiffs reiterated that HTS 7214.10 covered forged steel and there was nothing in the record indicating

that Plaintiffs used forged inputs in the production of subject merchandise.  Commerce asked

several questions regarding the type of steel used as inputs for its subject merchandise, including

whether forged steel was used.  Plaintiffs' counsel responded that he was uncertain whether

forged steel was used to produce subject merchandise.

On July 6, 2000, Commerce issued its *Final Results* in the 1998/1999 administrative

reviews.  The agency determined that because verified information indicated one of the

respondents in the underlying administrative reviews used forged bar as a factor of production,

Indian HTS category 7214.10 was the proper category under which to determine the surrogate

value for steel bar.

On July 17, 2000, Plaintiffs requested that Commerce correct a ministerial error

contained in the *Final Results.*  Plaintiffs claimed that Commerce had relied upon Indian import

data for only a portion of the period of review.  Plaintiffs argued they had submitted data for the

entire period of review in their March 28, 2000 submission, but that Commerce failed to utilize

that data in the *Final Results.*  Commerce recognized its error and made the correction requested

by Plaintiffs.  In addition, Commerce noted that it had failed to incorporate the full period of

review data for all factors of production in its *Final Results.*  Commerce, therefore, not only

adjusted the factor indicated by Plaintiffs, but also adjusted all the factors of production used to

calculate normal value.  Further, Commerce determined that the data for "spring steel" contained

in HTS category 7214.10 was aberrational and, therefore, excluded it from the surrogate value.

Because of the adjustments and the decision to exclude spring steel, Commerce changed its steel

bar surrogate value from HTS category 7214.10 to the subcategory 7214.10.09 – a category that

explicitly excludes spring steel.

Plaintiffs timely filed suit with this Court challenging several aspects of Commerce's final and amended final determinations. Specifically, Plaintiffs challenge: (1) Commerce's selection of HTS category 7214.10.09 to value a specific factor of production; (2) Commerce's adjustment of several factors of production through the correction of a ministerial error; and (3) Commerce's selection of a surrogate value for pallets. The United States and Defendant-Intervenor (collectively, Defendants) oppose Plaintiffs' motion. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1581(c).

### DISCUSSION

It is broadly recognized that Commerce is the master of the antidumping laws and that its determinations are to be afforded considerable deference. *See, e.g., Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996); *Daewoo Elec. Co., Ltd. v. International Union*, 6 F.3d 1511, 1516 (Fed. Cir. 1993). Despite this recognition, Commerce may not act arbitrarily, violate the antidumping laws, or apply the law in a manner contrary to congressional intent. *See Allied Tube & Conduit Corp v. United States*, 127 F. Supp. 2d. 207, 219 (Ct. Int'l Trade 2000), *citing*, *Smith Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983); *Hussey Copper Ltd. v. United States*, 895 F. Supp. 311, 314 (Ct. Int'l Trade 1995). Thus, the Court reviews Commerce's determinations to see whether they are "supported by substantial evidence and otherwise in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i) (1994).

The substantial evidence standard applies to Commerce's factual findings. This standard requires more than a "mere scintilla" of evidence, *Primary Steel, Inc. v. United States*, 834 F. Supp. 1374, 1380 (Ct. Int'l Trade 1993), and consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Under this standard, the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion. *See Heveafil Sdn. Bhd. & Filati Lastex Sdn. Bhd. v. United States*, 2001 WL 194986, *2 (Ct. Int'l Trade), *citing, Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984).

"Otherwise in accordance with law" governs Commerce's legal interpretations of the statutes it administers. To determine whether Commerce's interpretation and application of the antidumping statutes are in accordance with law, the Court applies the two-step test set forth by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resource Defense Counsel, Inc.*, 467 U.S. 837, 842 (1984). Under this test, the Court examines whether the relevant statute addresses the specific question at issue, and if not, whether the agency's statutory interpretation is reasonable in light of the overall statutory scheme. *See id.* at 842-43. Although considerable weight must be accorded to Commerce's construction of the antidumping statute, s*ee E.I. DuPont De Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 858 (Ct. Int'l Trade 1998), the Court does not fulfill its duty to say what the law is by perfunctorily agreeing with Commerce's interpretation of the statutory provision at issue. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). Rather, through the application of traditional tools of statutory construction, the Court must examine whether Congress expressed its intent on the matter at issue. Only if Congress was silent or ambiguous with respect to the question at issue can the Court assess whether Commerce's construction thereof is reasonable or whether it is merely a *post hoc* rationalization. *See id.* at 882. To survive judicial scrutiny, however, "an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable

interpretation… [A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *U.S. Steel Group v. United States*, 225 F.3d 1284, 1287 (Fed. Cir. 2000); *NSK Ltd. v. United States,* 115 F.3d 965, 973 (Fed. Cir. 1997); *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (internal citation omitted) (emphasis in original).

### A.      Commerce's Selection of Indian HTS Category 7214.10.09 as a Surrogate Value for Steel Bar

The antidumping law clearly establishes the standard by which Commerce is to determine the normal value of merchandise exported from a non-market economy.  Commerce must value the factors of production based on the "best available information"[1] in "one or more market economy countries that are at a level of economic development comparable to that of the non-market economy country" and that is a significant producer of "comparable" subject merchandise.  19 U.S.C. §1677b(c)(4) (1994).  Commerce historically has been afforded substantial discretion in determining what is the best available information.  *See, e.g., Novachem Inc. v. United States*, 797 F. Supp. 1033, 1037 (Ct. Int'l Trade 1992).  Ordinarily, this information would be derived from answers to the questionnaires Commerce issues during the investigation.  Where, however, a respondent fails to respond to Commerce's questions or fails to provide sufficiently detailed information, Commerce has been given the latitude to determine

---

[1] The "best available information" standard set forth in 19 U.S.C. §1677b(c) should not be confused with the "facts otherwise available" standard set forth in 19 U.S.C. §1677e (previously referred to as the "best information available.")  The former standard guides Commerce's valuation of factors of production when the agency is forced to calculate normal value using a market economy surrogate for a non-market economy respondent.  In all such cases, Commerce is obligated to determine that the information upon which it bases its surrogate values is the best available, regardless of whether the information relates directly to the respondent's production or is secondary information regarding prices and values in the surrogate country.  The latter is a more general standard that governs Commerce's actions where there is insufficient record evidence to make a finding, a party withholds relevant information, a party significantly impedes an investigation, or the agency is unable to verify certain information.

what constitutes the best information otherwise available. *See Manifattura Emmepi S.p.A. v. United States*, 799 F. Supp. 110, 115 (Ct. Int'l Trade 1992).

Despite the broad latitude afforded Commerce and its substantial discretion in choosing the information it relies upon, the agency must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c) – to obtain the most accurate dumping margins possible. *See Writing Instrument Mfrs. Ass'n. v. United States*, 984 F. Supp. 629, 637 (Ct. Int'l Trade 1997). This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents. *See, e.g., Allied Tube and Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1095 (Ct. Int'l Trade 2001); *Usinas Siderurgicas De Minas Gerais v. United States*, 1998 WL 442297, * 18 (Ct. Int'l Trade); *AK Steel Corp. v. United States*, 988 F. Supp. 594, 605 (Ct. Int'l Trade 1997); *Manifattura Emmepi S.p.A.*, 799 F. Supp. at 115 (stating that the ITA can not choose information out of context). Accordingly, although the standard of review applicable to this case precludes the Court from rendering judgment on whether the surrogate value chosen by Commerce was the absolute best available, precedent clearly establishes that the Court may judge whether Commerce's selection was reasonable. Anything less would simply be judicial abdication.

Plaintiffs' arguments can be divided into two categories, both questioning the rational relationship between Commerce's decision to use Indian HTS category 7214.10.09 and its steel inputs. First, Plaintiffs contend Indian HTS category 7214.10.09 is a basket category that covers forged and other high-end specialty steel and, because nothing in the record indicates Plaintiffs used forged steel to manufacture subject merchandise, Commerce's selection is unsupported by

---

When confronted with such situations, Commerce is statutorily permitted to use secondary, publicly available information as the basis for its factual conclusions.

substantial evidence and otherwise not in accordance with law. Second, Plaintiffs argue that the selection of Indian HTS category 7214.10.09 was not in accordance with law because Commerce disregarded substantial amounts of data reflecting prices *in* India that would have provided a better surrogate value contrary to the statutory requirement that surrogate values be based on factors of production *in* the surrogate country. The following sections detail the parties' contentions, as well as the Court's analysis and conclusions.

1.     Commerce's decision to use Indian HTS category 7214.10.09 to calculate the surrogate value for forged steel was supported by substantial evidence and otherwise in accordance with law.

   a.     *Parties' Contentions*

Plaintiffs' primary contention is that Indian HTS category 7214.10.09 covers "forged" steel and that there is no evidence Plaintiffs used such steel as an input to the production of subject merchandise. To the contrary, Plaintiffs argue that the record clearly demonstrates each of the steel inputs for subject merchandise was comprised of "merchant grade steel." Plaintiffs note that because heavy forged hand tools are produced through forging, the use of forged steel in the production of heavy forged hand tools runs counter to normal business practice.

Plaintiffs further maintain Commerce's conclusion that imported forged steel was used in the production of heavy forged hand tools was based solely on information obtained from the Shandong Machine Corporation – a separate company that did not produce the same subject merchandise as Plaintiffs. Plaintiffs allege that "separate orders" covered the four categories of subject merchandise and that Commerce conducted "separate reviews" for each of these orders. As such, Plaintiffs argue Commerce may not lawfully use factual information from one review in order to establish the surrogate value for another review.

The United States and Defendant-Intervenor (collectively, Defendants) counter that Commerce's decision to use Indian HTS category 7214.10.09 was supported by substantial record evidence indicating that forged steel was used to produce heavy forged hand tools. During the course of the administrative review, Commerce discovered that at least one respondent had imported steel that fit within Indian HTS category 7214.10.09. From this discovery, Commerce concluded this tariff category would provide an accurate surrogate value for steel inputs.

Although acknowledging that the one respondent found to have used forged steel is not a plaintiff in this action and that "just because one respondent used forged bar to make hammers does not mean that the plaintiffs used forged bar to make axes/adzes and bars/wedges," Defendants argue that absent other more compelling evidence, Commerce's conclusion is reflective of the best available information. Defendants argue that nothing on the record confirms Plaintiffs claim that its component steel was of merchant grade quality because Plaintiffs failed to submit relevant information on this issue. Defendants further argue that although Commerce is statutorily obligated to value factors of production according to the best available information, when this value is challenged on appeal, it is sufficient to demonstrate that Commerce's decision is supported by substantial evidence. Thus, the Court's role is not to judge whether "the information chosen by Commerce is the 'best' actually available, but whether the choice is supported by substantial evidence and in accordance with law."

        b.     *Analysis*

Because China is a non-market economy, Commerce calculated normal value based on surrogate values obtained from India, a market economy similarly situated in terms of economic

development and production capabilities. The question confronting the Court is whether

Commerce's use of Indian HTS category 7214.10.09 as a surrogate value for steel inputs is

supported by substantial evidence. As discussed earlier, Commerce values the factors of

production in a non-market economy "based on the best available information regarding the

values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1) (1994). Since the

statute does not specify what constitutes the best available information, these decisions are

within Commerce's discretion. Accordingly, Commerce need not prove that its methodology

was the only way or even the best way to calculate surrogate values for factors of production as

long as it was reasonable. When Commerce's method is challenged, the Court's proper role is to

determine whether the methodology is in accordance with law and supported by substantial

evidence. Assuming both criteria are satisfied, the Court will not impose its own views as to the

sufficiency of the agency's investigation or question the agency's methodology.

At the outset, the Court rejects Plaintiffs' argument that Commerce unlawfully

incorporated data from a separate review when it selected forged steel as a factor of production.

Although Plaintiffs argue that heavy forged hand tools are covered by four separate orders, the

record makes clear that each category of hand tool is covered by a single antidumping order: A-

570-803. *See Antidumping Duty Orders: Heavy Forged Hand Tools, Finished or Unfinished,*

*With or Without Handles, From the People's Republic of China*, 56 Fed. Reg. 6,622, 6,622

(February 19, 1991). *See also Antidumping or Countervailing Duty Order, Finding or*

*Suspended Investigation; Opportunity to Request Administrative Review,* 64 Fed. Reg. 6,878,

6,878 (February 11, 1999) (listing the orders that are subject to review and including all four

categories of hand tools under antidumping duty order A-570-803). From the inception of this

order Commerce has reviewed these categories jointly, either overlapping data or utilizing

category-specific data as appropriate. Nothing differentiates Commerce's methodology in the present reviews from that used in the past. Thus, the mere fact that Commerce selected a factor of production based on information from a respondent not a party to the present litigation does not alone invalidate the agency's *Final Determination.* The validity of Commerce's determination will turn on whether substantial evidence supports its conclusions and whether the agency's methodology is in accordance with law.

This Court has repeatedly upheld the use of surrogate data to value certain factors of production when that data amounts to the best available information. *See Olympia Indus. Inc. v. United States*, 7 F. Supp. 2d 997, 1000, n.2 (Ct. Int'l Trade 1998). *See also Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1018 (Ct. Int'l Trade 1992) ("Commerce's ability to construct foreign market value from weighted alternatives advantageously serves the antidumping statute's purpose of 'determining current margins as accurately as possible'"). The Court has further held that surrogate values may provide the best information available even though "the surrogate values used by Commerce in [non-market economy] cases are fictional." *Olympia Indus.,* 7 F. Supp. 2d. at 1001. As such, in the present case there is no question that Commerce's use of surrogate values is a reasonable method of calculating normal value. The issue, therefore, is whether the chosen value is supported by substantial evidence.

Despite Plaintiffs' arguments to the contrary, the Court is compelled to find that Commerce's selection of Indian HTS category 7214.10.09 is supported by substantial evidence. Although recognizing that "it is improper [for Commerce] to use tariff items covering inappropriate surrogate materials in lieu of another tariff item that covers the appropriate surrogate material," *Writing Instrument Mfrs. Ass'n.*, 984 F. Supp. 639-40, *quoting*, *Sigma Corp. v. United States*, 888 F. Supp. 159, (Ct. Int'l Trade 1995), in light of the record evidence, the

Court must conclude Commerce's determination that forged steel was used in the production of subject merchandise was reasonable.

The Court's conclusion does not come easily, however. Commerce determined that one of the respondents had imported steel under a tariff heading covering forged steel bar and rod. Based on this conclusion, Commerce selected the Indian Tariff schedule that most closely reflected the type of steel imported by the respondent – Indian HTS category 7214.10.09. Commerce additionally used Plaintiffs' questionnaire responses as evidence that Plaintiffs failed to establish their products were manufactured with non-forged steel. Commerce further relied upon statements made by Plaintiffs' counsel at an administrative hearing as proof that forged steel likely was used by Plaintiffs to produce subject merchandise:

> In the spirit of honesty and cooperation, and so on, I would say that on the record, I can't say that it is forged. I can't say that it is not forged, because I don't think that question was ever asked, [sic] nor answered. The portions of the record cited by Defendants provide only the barest of support for Commerce's conclusion that one of the respondents used forged steel as a component in the production of subject merchandise.

The evidence relied upon by Commerce is not overwhelming. The record evidence cited provides little more than the barest support for Commerce's conclusions. Likewise, the comments made by Plaintiffs' counsel serve only to create additional ambiguity surrounding the use of forged steel. The Court, however, is bound by the standard of review established by Congress. Congress has granted Commerce substantial discretion and has bound the Court to respect that discretion, even where the Court would have reached a different conclusion if it had been the ultimate trier of fact. The Court likely would have reached a different conclusion had this case been reviewed *de novo*. Nevertheless, despite its tenuous nature, the Court must conclude that *in toto* there is more than a "mere scintilla" of evidence supporting Commerce's determination. The Court recognizes that the record also provides some evidence that Plaintiffs

actually used "merchant grade" steel in the production of subject merchandise. The presence of this contradictory evidence, however, is insufficient to negate the validity of Commerce's conclusion. It is well established that substantial evidence supporting an agency's determination may exist even when there is sufficient evidence to support a reasonable, but contrary conclusion. *See Heveafil Sdn. Bhd*, 2001 WL 194986, *2 (Ct. Int'l Trade), *citing, Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1563. Plaintiffs could prevail only if they demonstrated that Commerce's conclusion was unreasonable. In the absence of such proof, the Court finds that Commerce's selection of Indian HTS category 7214.10.09 is supported by substantial evidence and otherwise in accordance with law.

2.      Commerce's use of import data to calculate the surrogate value of forged steel is supported by substantial evidence and otherwise in accordance with law.

a.      *Parties' Contentions*

Plaintiffs contend that Commerce is statutorily required to value factors of production based on prices and information from within the chosen country. Specifically, Plaintiffs cite 19 U.S.C. §1677b(c)(4), which states that Commerce shall value a non-market economy's factors of production, to the extent possible, in one or more market economies at the same level of economic development and that are significant producers of comparable merchandise. Taking a literal approach to the "in a market economy," Plaintiffs argue that "the best choice for selecting a price 'in' India is a domestic Indian price." In support of this argument, Plaintiffs note that in addition to being a significant producer of heavy forged hand tools, India is a significant producer of steel and, therefore, only imports specialty steel not normally associated with the production of subject merchandise. Accordingly, Plaintiffs argue that the import prices reflected

in Indian HTS category 7214.10.09 are inaccurate and bear no rational relationship to the actual value of steel inputs actually used *in* India.

Plaintiffs finally argue that Commerce's use of domestic Indian prices as the surrogate values for coal and electricity further supports its claim that import prices, as reflected in Indian HTS category 7214.10.09, were an inappropriate surrogate value. Plaintiffs take the allegedly disparate treatment of steel, coal, and electricity, and conclude that "Commerce failed totally to conduct a reasonable review…. The fact that [merchant grade steel bar] is steel "bar" does not mean that it is comparable to Indian [HTS] category 7214.10."

Defendants counter that Commerce reasonably exercised its discretion in selecting import data as opposed to domestic Indian prices to value forged steel bar.

   b.      *Analysis*

Plaintiffs', in essence, ask the Court to do two things. First, they ask the Court to construe the meaning of "in" within the context of 19 U.S.C. §1677b(c)(4). Second, assuming a statutory construction favorable to Plaintiffs, they ask the Court to reevaluate the evidence and draw a factual conclusion different from that of the administering agency. The Court is unable to fulfill either request.

As stated, Commerce's authority to control, administer, and interpret the antidumping laws is universally recognized and customarily afforded substantial deference. To determine whether Commerce's construction of 19 U.S.C. §1677b(c)(4) is "in accordance with law," the Court first must determine whether Congress has expressly addressed the issue. *See Chevron*, 467 U.S. at 842-43. This Court has already addressed this issue in *Shakeproof Assembly Components Division of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d. 1354, 1356-57

(Ct. Int'l Trade 1999). In *Shakeproof*, the plaintiff argued that the use of import prices to value non-imported material is contrary to law because 19 U.S.C. §1677b(c) requires that valuation be based on factors *in* a surrogate economy. 59 F. Supp. 2d. at 1356. The Court initially noted that "[n]owhere does the statute speak directly to any methodology Commerce must employ to value the factors of production" and that "the very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work." *Id*. at 1357, *citing*, *Olympia Indus. v. United States*, 7 F. Supp. 2d 997, 1000, (Ct. Int'l Trade 1998) ("The relevant statute does not clearly delineate how Commerce should determine what constitutes the [best available information]"). The Court went on to find that the phrase "to the extent possible" is "[a]nother signal that Congress did not speak and therefore left Commerce discretion in developing the details of its methodology." *Id.* From this language, the *Shakeproof* court concluded "the statute grants discretion to Commerce to decide what qualifies as the best available information." *Id.*

The Court is persuaded by the logic and rationale underlying the *Shakeproof* holding. The language and structure of 19 U.S.C. §1677b(c)(4) clearly indicates that Congress intended to grant Commerce discretion to determine what constitutes the best available information from which to select a surrogate value. Thus, having confirmed that 19 U.S.C. §1677b(c)(4) endows Commerce with discretion, the Court must determine whether Commerce's use of Indian import data was reasonable.

Commerce defended its use of Indian import data on two grounds. First, the domestic pricing data provided by Plaintiffs did not contain data for forged steel bars and Commerce had already concluded that forged bars would serve as the basis for establishing the surrogate value. Second, Commerce stated that "[i]t is the Department's practice, when the data are equal in

terms of specificity, contemporaneity, and representativeness, to use an import price over a domestic price because the former is reported on a duty-exclusive, tax-exclusive basis, while the latter almost always is not." *See Issues & Decision Memo for the Administrative Reviews of Heavy Forged Hand Tools from the People's Republic of China – February 1, 1998 through January 31, 1999*, reprinted at, Plaintiffs Appendix, Tab 8. (*Issues & Decision Memo*).

The Court has already found Commerce's selection of forged steel as a factor of production to be reasonable. In light of this finding, the Court's reasonableness inquiry must now focus on whether Commerce's use of import data constituted the best available information from which to value forged steel *in* India. The alternatives suggested by Plaintiffs consisted of domestic Indian prices and export prices for non-forged steel bar and billet. Commerce reasonably concluded that these categories could not produce a viable surrogate value for forged steel. Indeed, it is difficult for the Court to comprehend how Plaintiffs could argue that such divergent products were readily comparable. Asking the Court to determine whether the value of non-forged steel is comparable to and accurately reflects the underlying value of forged steel is equivalent to asking the Court, as Justice Scalia once quipped, to "judg[e] whether a particular line is longer than a rock is heavy." *Bendix Autolite Corp. v. Midwesco Enter. Inc.*, 486 U.S. 888, 896 (1988) (Scalia, J., concurring). The best available information is that which provides a suitable basis of comparison between the factor of production selected by Commerce and comparable merchandise *in* India. In the present case, the data pertaining to imported forged steel satisfies this requirement. Thus, the Court finds Commerce's use of Indian import data to be reasonable.

Moreover, the Court notes that Commerce's use of import data comports with its well-established practice. As stated, when the data are equal in terms of specificity, contemporaneity,

and representativeness, Commerce's practice is to use an import price over a domestic price because the former is reported on a duty-exclusive, tax-exclusive basis, while the latter almost always is not. The Court finds this practice to be wholly reasonable and consistent with the antidumping law's underlying purpose of calculating the fairest and most accurate margins possible. In light of this finding, the Court will not overturn Commerce's factual conclusion that import data provided more accurate information than did the alternative Indian domestic and export data. Despite the potential relevance of the domestic prices cited by Plaintiffs, the Court will not reweigh the evidence and substitute its judgment for that of the administering agency in the face of substantial evidence.

Finally, the mere fact that Commerce used domestic prices to value some factors of production is insufficient to negate the validity of Commerce's use of import data to value forged steel. Nothing in 19 U.S.C. §1677b(c) establishes the explicit methodology Commerce must employ to select surrogate values. Rather, Commerce's methodology must be guided by the antidumping law's underlying purpose of calculating the most accurate dumping margins possible. Thus, the courts will not hamper Commerce's freedom to choose data that effectuates this purpose. Additionally, the United States Court of Appeals for the Federal Circuit has affirmed Commerce's use of import prices even when domestic prices were used to value other factors of production. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1378 (Fed. Cir. 1999). The Court, therefore, finds that Commerce's use of import data is supported by substantial evidence and otherwise in accordance with law.

**B.** **Commerce's Correction of a Ministerial Error**

In its *Preliminary Results*, Commerce indicated that the surrogate values used to calculate normal value were based on data reflecting only half of the period of review. Commerce also indicated in the *Preliminary Results Surrogate Value Memorandum*, issued on the same day, that partial-year data was used because "Indian import statistics for the remainder of the [period of review] were not published" at the time the *Preliminary Results* were issued. On March 28, 2000, one month following the publication of the *Preliminary Results*, Plaintiffs submitted a case brief providing Commerce with complete data for the entire period of review. The information provided was taken from the same public sources Commerce had relied upon to establish the surrogate values in its *Preliminary Results.* Due, however, to an apparent agency oversight, Commerce never reviewed or incorporated this information into Commerce's *Final Results.* As such, the surrogate values used to calculate the final normal value were inaccurate. Following publication of the *Final Results*, Plaintiffs petitioned Commerce to address this omission and correct its ministerial error. Plaintiffs, however, limited their request to the correction of only one factor of production.

On August 1, 2000, Commerce issued amended final results acknowledging its failure to fully consider the updated data, and adjusting the value of the factor of production requested by Plaintiffs. Additionally, Commerce noted that by overlooking the March 28, 2000 case brief, it had failed to update surrogate values for all relevant factors of production. Thus, because Commerce had asserted throughout the administrative review that it intended to use full year surrogate value data, the agency adjusted each of the factors of production relied upon to establish normal value. These adjustments raised normal value, thereby increasing the resultant dumping margins.

Plaintiffs argue Commerce's actions exceed its authority as set forth in 19 U.S.C.

§1675(h). This section provides:

> The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. <u>Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors.</u> As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like and any other type of unintentional error which the administering authority considers ministerial.

(Emphasis in Plaintiffs' brief). The procedures established by Commerce to enforce this statute

are found in 19 C.F.R. §351.224, and provide:

> (c) A party to the proceeding to whom the Secretary has disclosed calculations performed in connection with a preliminary determination may submit comments concerning a significant ministerial error in such calculations. A party to the proceeding to whom the Secretary has disclosed calculations performed in connection with a final determination or the final results of a review may submit comments concerning any ministerial error in such calculations…

> (d) Comments filed under [the above paragraph] must explain the alleged ministerial error by reference to applicable evidence in the official record, and must present what, in the party's view, is the appropriate correction… Replies to any comments must be limited to issues raised in such comments.

> (e) The Secretary will analyze any comments received and, if appropriate, correct any significant ministerial error by amending the preliminary determination, or correct any ministerial error by amending the final determination or the final results of review (whichever is applicable)…

Plaintiffs note that their July 17, 2000 comments and request to correct a ministerial error

were limited to the recalculation of the steel billet surrogate value. Because Commerce exceeded

the scope of this original request without seeking any additional input from the parties, Plaintiffs

argue that their right to "present their views" on these additional surrogate values was violated.

Alternatively, Plaintiffs argue Commerce's corrections were not ministerial in nature because they involved significant discretionary considerations. Plaintiffs note that although Commerce may, with or without a party's request, correct errors that it reasonably regards as ministerial in final determinations, the agency's decision to do so must not be arbitrary, capricious, or unsupported by substantial evidence. Plaintiffs argue the corrections made by Commerce fall outside what is normally perceived as ministerial error. Moreover, Plaintiffs argue Commerce's assertion that they intended to use the full year data but simply forgot is nothing more than a post-hoc, self-serving litigation strategy – "Commerce did not just forget about the one-hundred-and-eighty-four (184) page March 28 submission, it just never intended to use it for any purpose." Thus, Plaintiffs argue that it is not reasonable to characterize the changes as ministerial.

Quoting a July 7, 2000 surrogate values memo, the United States counters that Commerce always intended to use "Indian prices contemporaneous with the [period of review.]" (United States' Brief, at 20). The United States argues that Commerce's policy is to calculate surrogate values based on "publicly available published information or other publicly available sources for information regarding prices in India during the [period of review];" however, at the time the preliminary determinations were made, "Indian import statistics for the [entire period of review] were not published…." (Id. at 44, *quoting*, Commerce's Preliminary Results Surrogate Memo, at 2; and Commerce's Final Results Surrogate Memo, at 2.) Thus, the United States argues that Commerce's failure to incorporate data properly contained in the record into the *Final Results*, despite an expressed intent to do so, constitutes an unintentional ministerial error.

For several reasons, the Court is persuaded that the United States is correct. First, the Court can find no support for Plaintiffs' contention that Commerce should be limited to

correcting only those ministerial errors requested by an interested party. Neither the relevant statutes nor Commerce's regulations impose such a restriction, and case law clearly establishes that "Commerce may, *with or without a party's request*, correct errors that it reasonably regards as ministerial in final determinations." *Aramide Maatschappij V.o.F. v. United States*, 901 F. Supp. 353, 361-62 (Ct. Int'l Trade 1995) (Emphasis added). The statutory and regulatory provisions Plaintiffs cite merely ensure that interested parties have the right to highlight errors that Commerce may have made and to present arguments in support of correcting those errors. Nothing in the cited provisions precludes Commerce from acting to correct errors it discovers on its own accord. Because Plaintiffs only pointed out the error associated with the steel billet surrogate value, Commerce's conclusion that all the factors of production should be updated was clearly reached *sua sponte*. Restricting Commerce in the manner suggested by Plaintiffs would be tantamount to granting parties the power to manipulate administrative determinations by selectively withholding and updating data. Such power is anathema to Commerce's broad authority to correct ministerial errors and its underlying obligation to calculate the most accurate dumping margins possible.

Second, despite Plaintiffs' argument to the contrary, the Court finds that the "errors" at issue are ministerial. Plaintiffs initially acknowledge the ministerial nature of these errors and argue that Commerce could only correct the "ministerial error" they highlighted. Plaintiffs, however, later argue that the "errors" Commerce corrected required the application of discretionary considerations and, therefore, were neither "ministerial," nor amenable to correction under 19 U.S.C. § 1675h. Statute, regulations, and case law largely leave the question of what constitutes a "ministerial error" to Commerce's discretion. Both the relevant statute and Commerce's regulations broadly define "ministerial error" as

> … an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and *any other similar type of unintentional error which the Secretary [or administering authority] considers ministerial.*

19 C.F.R. § 351.224(f) (2000); 19 U.S.C. § 1675h (Emphasis added). This Court has recognized the broad nature of Commerce's definition and consistently granted the agency substantial discretion in determining which errors are "ministerial." *See Fabrique de Fer de Charleroi, S.A. v. United States*, 2001 WL 630995, *12 (Ct. Int'l Trade), *citing*, *Cemex, S.A. v. United States*, 19 CIT 587, 593 (1995) ("Commerce is given fairly broad discretion to determine which types of unintentional error to regard as ministerial."). Moreover, where Commerce identifies an error as "inadvertent," the Court has frequently held that it may uphold the correction as a ministerial error. *See Fabrique de Fer de Charleroi, S.A*, 2001 WL 630995, *12; *Geneva Steel v. United States*, 914 F. Supp. 563, 607 (Ct. Int'l Trade 1996) (basing, in part, its conclusion that Commerce's failure to aggregate the grants received was an error of addition and therefore Commerce's characterization of the error as "inadvertent" was a ministerial error).

In the present case, Commerce failed to incorporate surrogate value data from the entire period of review into its final determination. Although 19 U.S.C. §1677b(c) specifies the type of data Commerce should use in calculating surrogate values, it fails to specify the time period from which the surrogate values are to be taken. Despite the absence of statutory guidance, the Court has recognized that Commerce's practice is to use surrogate value data that is contemporaneous with the period of review. *See Coalition for the Pres. of the American Brakedrum and Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 259 (Ct. Int'l Trade 1999) ("Commerce's practice is to use publicly available values which are representative of a range of prices within the [period of investigation]"); *Union Camp Corp. v. United States*, 941 F. Supp. 108, 116 (Ct. Int'l Trade 1996) (noting that Commerce will select, where possible, publicly available published

value which is: (1) an average non-export value; (2) representative of a range of prices within the POI; (3) product-specific; and (4) tax-exclusive).  Commerce reflected this practice in its *Preliminary Results Surrogate Memorandum* and again in its *Final Results Surrogate Value Memorandum* when it stated "[w]here possible we value factors of production using publicly available published information or other publicly available sources for information regarding prices in India *during the [period of review.]*" (United States' Appendix, Tab 11, at 2; Plaintiffs' Appendix, Tab 9, at 2.)  (Emphasis added.)  Commerce further stated that it "valued [factors of production] using publicly available import statistics for the period February through August 1998… Indian import statistics for the remainder of the [period of review] were not published at the time [Commerce] prepared this memorandum."  (Id.)

Under normal conditions and absent evidence to the contrary, the Court presumes that Commerce acts or seeks to act in a regular manner consistent with its established practices. Commerce indicated during its investigations that its calculations were made on partial period of review data only because more comprehensive data was not available.  Commerce also characterized its failure to incorporate the full-year data into its final determination as "inadvertent."  Given the remarks found in the surrogate value memorandum and Commerce's well-established practice of using data that incorporates the entire period of review, the Court finds Commerce's characterization to be reasonable.  Moreover, the Court finds that the application of the full year data did not require discretionary consideration by Commerce.  Had this information been available at the time the preliminary results were issued, Commerce would have considered it as a matter of course.  Likewise, when this information was ultimately brought to Commerce's attention, the agency adhered to its long-standing policy and unquestioningly considered the data.  Thus, notwithstanding Plaintiffs' claim that "Commerce

did not just forget about the one-hundred-and-eighty-four (184) page March 28 submission, it just never intended to use it for any purpose," Plaintiffs have not demonstrated anything that would cause the Court to conclude Commerce either intentionally disregarded the submitted information or in its discretion determined it was inapplicable. Likewise, Plaintiffs have demonstrated nothing that would rebut the presumption that Commerce intended to act regularly and in a manner consistent with its established practice. Thus, the Court is left to conclude that Commerce's characterization of its "error" as an unintentional omission is reasonable and supported by substantial evidence.

Finally, the Court finds that the antidumping law's underlying purpose of using the best available information to determine the most accurate dumping margins is furthered by the correction of the ministerial error. Were the Court to adopt Plaintiffs' position restricting the information Commerce can rely upon to that contained in the narrowly drafted request to correct a ministerial error, it would be sanctioning a practice that ultimately would skew the antidumping duty margins. Such a restriction would unreasonably restrict Commerce's ability to calculate fair and accurate dumping margins. Thus, in light of the ministerial nature of the corrected errors, the Court finds Commerce's actions to be reasonable, supported by substantial evidence, and otherwise in accordance with law.

### C. Commerce's Selection of Surrogate Values for Pallets

Plaintiffs argue Commerce's selection of surrogate value for pallets was unsupported by substantial evidence and not in accordance with law. Specifically, Plaintiffs argue that Commerce improperly used a surrogate value that the agency had expressly rejected in a prior segment of the proceeding. The United States concedes that Commerce used an inappropriate

surrogate value and acknowledges the issue should be remanded so that the agency can determine the proper surrogate value. Defendant-Intervenor does not address this issue in its brief and the Court concludes, therefore, that it does not oppose remand. The Court agrees with the conclusion reached by the parties and finds Commerce's selection of pallet surrogate value to be unsupported by substantial evidence and otherwise not in accordance with law. The issue, therefore, is remanded to Commerce for determination of the appropriate surrogate value. Commerce shall complete this task and file its findings with the Court no later than forty-five (45) days from the date this opinion is issued.

## CONCLUSION

For the reasons stated above, the Court finds that Commerce's selection of Indian HTS category 7214.10.09 is supported by substantial evidence and otherwise in accordance with law. The Court further finds that Commerce did not exceed its authority when it adjusted the surrogate values for all factors of production under the auspices of correcting a ministerial error. Finally, the Court finds that Commerce's selection of a surrogate value for pallets is not supported by substantial evidence. Accordingly, the Court remands this issue to Commerce for recalculation. In all other respects, Commerce's *Final Determination* and *Amended Final Determination* are sustained.

_____
Gregory W. Carman,
Chief Judge

Dated: July 23, 2001
          New York, NY